PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STATE OF WEST VIRGINIA,
                        *Petitioner,*

v.

TOMMY G. THOMPSON, Secretary of
the United States Department of
Health and Human Services,
                        *Respondent.*

No. 03-1841

On Petition for Review of an Order
of the Secretary of Health and Human Services.
(2002-13)

Argued: December 1, 2006

Decided: January 19, 2007

Before WILKINS, Chief Judge, WILKINSON, Circuit Judge,
and Henry F. FLOYD, United States District Judge
for the District of South Carolina, sitting by designation.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Chief Judge Wilkins and Judge Floyd joined.

---

## COUNSEL

**ARGUED:** Silas Bent Taylor, Senior Deputy Attorney General,
OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA,
Charleston, West Virginia, for Petitioner. Susan Maxson Lyons,
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN

SERVICES, Office of General Counsel, Washington, D.C., for Respondent. **ON BRIEF:** Rocco Fucillo, General Counsel, WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN SERVICES, Charleston, West Virginia, for Petitioner. Peter D. Keisler, Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Paula M. Stannard, Acting General Counsel, Kathleen H. McGuan, Associate General Counsel, Mark D. Polston, Deputy Associate General Counsel for Litigation, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Washington, D.C., for Respondent.

---

## OPINION

WILKINSON, Circuit Judge:

The State of West Virginia appeals a final decision by the Secretary of Health and Human Services denying approval of an amendment to West Virginia's Medicaid Plan. Federal law requires that states participating in Medicaid recoup some costs by recovering funds from the estates of recipients of Medicaid-funded long-term care. It also requires that states establish procedures to waive recoveries that "would work an undue hardship as determined on the basis of criteria established by the Secretary." 42 U.S.C. § 1396p(b)(3) (2000). West Virginia sought to implement these provisions by exempting more than $50,000 of every homestead from recovery, through an exemption for home equity up to the statewide mean appraised value of a home. The Secretary disapproved this exemption as too broad to constitute an "undue hardship" exception. We affirm his determination.

### I.

#### A.

Congress makes federal funds available to the states for medical services for needy citizens through the Medicaid program. 42 U.S.C. § 1396; *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). "The cornerstone of Medicaid is financial contribution by both the Federal

Government and the participating State." *Harris v. McRae*, 448 U.S. 297, 308 (1980). States that choose to participate in Medicaid have flexibility concerning the services they provide and the manner in which they provide them, but do not possess a blank federal check. In order to be reimbursed for a portion of the cost of care, they must maintain "state plans for medical assistance" that conform to requirements designed in part to safeguard the federal fisc and ensure that care meets federal standards. 42 U.S.C. § 1396a(a); *see also Wilder*, 496 U.S. at 502.

While Medicaid seeks to assist those who could not readily afford health care, individuals may sometimes receive benefits in spite of substantial assets. Medicaid generally disregards an individual's home equity interest in assessing long-term care eligibility unless the interest exceeds $500,000. *See* Pub. L. No. 109-171, § 6014, 120 Stat. 4, 64-65 (codified at 42 U.S.C. 1396p(f)(1)); *West Virginia v. Dep't of Health & Human Servs.* (*West Virginia I*), 289 F.3d 281, 284 (4th Cir. 2002). Until passage of the Deficit Reduction Act of 2005, even home equity interests of more than $500,000 could be excluded from eligibility calculations. *West Virginia I*, 289 F.3d at 284. "[T]he effect of this exclusion is to allow someone with a potentially valuable asset to receive benefits along with those who have greater financial need." *Id.* (internal quotations omitted).

Faced with rising health-care costs, Congress took steps to address this "anomaly" in 1993 by requiring that states attempt to recover costs of care after certain Medicaid recipients' deaths. *Id.*; *see also* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, § 13612, 107 Stat. 312, 627-28 (codified at 42 U.S.C. § 1396p(b)(1)(B)). Federal law now requires that after the death of a person who began receiving Medicaid assistance at age 55 or older, "the State shall seek adjustment or recovery from the individual's estate" for "nursing facility services, home and community-based services, and related hospital and prescription drug services." 42 U.S.C. § 1396p(b)(1)(B)(i). Prior to 1993, states had been allowed to choose whether or not to attempt to recover costs of care from Medicaid beneficiaries' estates, *see West Virginia I*, 289 F.3d at 284, and they are still permitted to engage in or abstain from recoveries for other "items or services under the State plan," 42 U.S.C. § 1396p(b)(1)(B)(ii). Potential recipients of Medicaid-funded long-term care are notified of

the estate recovery requirement before they accept benefits. *West Virginia I*, 289 F.3d at 285.

While federal law requires estate recoveries in some circumstances, it prohibits them in others. Estate recovery is not permitted until the death of a surviving spouse, or when the decedent has a surviving child under the age of 21, or when the decedent has a surviving child who is blind or disabled as defined under the statute. 42 U.S.C. § 1396p(b)(2). In addition, federal law requires "undue hardship" waivers by providing, "The State agency shall establish procedures (in accordance with standards specified by the Secretary) under which the agency shall waive the application of this subsection [except in limited circumstances not relevant here] if such application would work an undue hardship as determined on the basis of criteria established by the Secretary." *Id.* § 1396p(b)(3).

"Undue hardship" is not defined in the Medicaid statute. A House Budget Committee Report commented upon the term, however, stating that in establishing criteria for "undue hardship" the Secretary of Health and Human Services "should provide for special consideration of cases in which the estate subject to recovery is (1) the sole income-producing asset of survivors (where such income is limited), such as a family farm or other family business, or (2) a homestead of modest value or (3) other compelling circumstances." H.R. Rep. No. 103-111, at 209 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 378, 536.

The Secretary has the responsibility of determining whether proposed state plans and plan amendments meet federal Medicaid requirements. Congress has directed that the Secretary "shall approve" any plan or amendment that complies with federal law. 42 U.S.C. § 1396a(b). The Secretary in turn has delegated approval authority to the Administrator of the Centers for Medicare & Medicaid Services ("CMS"), a component of the Secretary's department formerly known as the Health Care Financing Administration ("HCFA"). 42 C.F.R. § 430.15(b) (2005). The Administrator consults with the Secretary before making a final determination of disapproval. *Id.* § 430.15(c)(2).

CMS promulgated guidance concerning undue hardship waivers in the State Medicaid Manual. The manual directs states to "[e]stablish

procedures and standards for waiving estate recoveries" in cases of undue hardship and to describe the resulting policies in their state plan documents. The manual indicates that undue hardship provisions need not be uniform, stating, "[y]ou have flexibility in implementing an undue hardship provision." It points to the House Report for guidance on the "undue hardship" term and reprints the report's examples, but adds that legislative history does not constitute a legally binding definition. The agency "suggests that you consider the examples listed above in developing your hardship waiver rules," the manual states, "but does not require you to incorporate these examples once you have considered whether they are appropriate for determining the existence of an undue hardship."

CMS amended the State Medicaid Manual to include additional guidance in 2001 — the same year that the Secretary abandoned a proposed rulemaking concerning the estate recovery and undue hardship provisions that had been listed on his agenda in the Federal Register since 1996. The new State Medicaid Manual provision stated, "In defining a homestead of modest value, the methodology the State uses to set a threshold level for the market value of a 'homestead of modest value' cannot be set so high as to negate the intent of the estate recovery program." It instructs participating states to "[d]escribe your methodology for determining a home of modest value in your State plan."

The new manual provision includes an example of a permissible waiver, taken from a New Mexico state plan amendment that CMS approved. It states that "a homestead of 'modest value' can be defined as fifty percent (50%) or less of the average price of homes in the county where the homestead is located, as of the date of the beneficiary's death." The Secretary has indicated that CMS has since approved other implementations of undue hardship waivers as well.

## B.

West Virginia began efforts to exempt estates from recovery in 2001.[1]

---

[1]West Virginia had previously challenged estate recovery in general. The state did not engage in such recoveries when they were optional

On March 8, it proposed exempting $50,000 of homestead property from all estate recoveries on the grounds that it would not be cost effective to pursue recoveries of such sums. (The State Medicaid Manual provides that states need not engage in estate recovery when doing so would not be cost effective.) After CMS requested additional information such as the cost of recovery, the state's methodology in determining cost effectiveness, and the financial impact of the proposed exemption, West Virginia changed its proposal and its justification. On September 13, 2001, the state proposed exempting from each homestead an amount equal to the statewide arithmetic mean appraised value of a West Virginia home, calculated annually by the West Virginia Department of Taxation and Revenue. This would have been $50,735 at the time of CMS' consideration. (This appraised mean value was approximately half of the mean selling price in the state, because West Virginia homes are appraised at well below market value.)

CMS Administrator Thomas A. Scully disapproved the proposed amendment as overbroad. West Virginia sought administrative review before a CMS hearing officer, who recommended that the disapproval be affirmed. She found that "the State's methodology, by not controlling for variation in home prices within the State, has the effect of exempting a high percentage of homes in many of the states' counties and therefore, will negate the intent of the estate recovery program." Administrator Scully adopted the hearing officer's proposed decision in May 2003. Because this constituted a final agency action, we have jurisdiction to review West Virginia's appeal under 42 U.S.C. § 1316.

---

under the Medicaid statute, and when they became mandatory, the state continued to abstain until the Department of Health and Human Services threatened "compliance proceedings" that "could result in West Virginia losing all or part of its Federal financial participation in the State's Medicaid Program." *West Virginia I*, 289 F.3d at 285. West Virginia responded by authorizing estate recoveries but bringing suit challenging the federal requirement as unduly coercive in violation of the Tenth Amendment. *Id.* at 286-87. We held that the estate recovery provision was not on its face so coercive as to raise a potential Tenth Amendment problem. *Id.* at 297.

## II.

The Administrative Procedure Act provides the standard of review, stating that a court shall "set aside agency action, findings, and conclusions" when they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (2000). A court shall also set aside agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" as well as actions "without observance of procedure required by law." *Id.* § 706(2)(C)-(D).

## III.

West Virginia first argues that the Secretary exceeded his authority or failed to follow required procedures when he rejected the state's proposed hardship waiver without first establishing regulations to define undue hardship. *See id.* § 706(2); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 417 (1971). West Virginia concedes that the Secretary has been given authority to establish criteria defining the scope of undue hardship waivers and to disapprove state plans that do not comply with these criteria under 42 U.S.C. § 1396p(b)(3), but it argues that such criteria may be established only through notice-and-comment rulemaking. Since neither the Secretary nor his delegate, the CMS Administrator, has promulgated hardship criteria through rulemaking, West Virginia argues that the disapproval of the hardship waiver in its estate recovery program exceeded the Secretary's authority and did not comport with procedures prescribed by federal law. *See* 42 U.S.C. § 1396a(b) (providing that Secretary "shall approve any plan" that fulfills conditions prescribed by law).

We reject this argument. West Virginia is of course correct that the Secretary cannot disapprove state plan amendments for failing to comply with a requirement that is without any statutory basis. But the disapproval here was not without warrant: 42 U.S.C. § 1396p(b)(3) grants the Secretary authority to establish criteria governing hardship waivers, and West Virginia's claim that these criteria can be established only through notice-and-comment regulation is unfounded.

Agencies are ordinarily permitted to choose in adjudication among permissible meanings of statutes they are charged with administering,

without spelling out their interpretations beforehand through notice-and-comment rulemaking. *Sec. & Exch. Comm'n v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 202-03 (1947); *Nat'l Labor Relations Bd. v. Bell Aerospace Co.*, 416 U.S. 267, 292-94 (1974); *Onslow County v. U.S. Dep't of Labor*, 774 F.2d 607, 610 (4th Cir. 1985); *see also Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 939 (9th Cir. 2005) (recognizing this authority in context of CMS Administrator's disapproval of Medicaid state plan amendment). A contrary rule would "stultify the administrative process," ignoring the benefits of adjudicatory development that have led courts to recognize "a very definite place for the case-by-case evolution of statutory standards":

> [P]roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective.

*Chenery II*, 332 U.S. at 202-03. The choice between rulemaking and adjudication "lies primarily in the informed discretion of the administrative agency." *Id.* at 203; *see also Bell Aerospace*, 416 U.S. at 294. The ability to proceed through adjudication may ultimately serve states' interests in the context of cooperative federalism programs like Medicaid by enabling federal authorities to take into account the circumstances of each state, rather than adopting a uniform rule better suited to some regions than to others.

West Virginia argues, however, that the undue hardship provision was intended to impose special procedural requirements upon the Secretary. We agree that Congress may require the Secretary to go through notice-and-comment proceedings, but West Virginia's argument that this statute imposes such an obligation inverts the provision's plain meaning. An agency's authority to adopt one of several

meanings of a statutory provision is often merely an implication of Congress' use of an ambiguous term, but here the authority is conveyed explicitly, by statutory language that provides, "The State agency shall establish procedures (in accordance with standards specified by the Secretary) under which the agency shall waive the application of this subsection . . . if such application would work an undue hardship as determined on the basis of criteria established by the Secretary." 42 U.S.C. § 1396p(b)(3). This explicit delegation of interpretive authority militates in favor of allowing the Secretary more than the usual interpretive leeway, not less. And the implied directive to the Secretary to establish criteria for hardship waivers conveys no hint of a command to act through particular mechanisms.

Indeed, when Congress has wanted the Secretary to go through notice-and-comment proceedings, it has said so. For example, the Social Security Act requires the Secretary to "establish a mechanism to recognize the costs of new medical services and technologies" and states that "[s]uch mechanism shall be established after notice and opportunity for public comment." *Id.* § 1395ww(d)(5)(K)(I). It also states that "[t]he Secretary *shall establish by regulation* a process for the enrollment of providers of services and suppliers under this subchapter," and that "[t]he Secretary *shall establish by regulation* procedures under which there are deadlines for actions on applications for enrollment . . ." *Id.* § 1395cc(j)(1)(A)-(B) (Supp. 2003) (emphasis added). It further provides that the Secretary "*shall establish by regulation* procedures" governing the basis and amount of payment for certain clinical diagnostic laboratory tests. *Id.* § 1395*l*(h)(8)(A) (Supp. 2003) (emphasis added). Congress has even explicitly directed notice-and-comment in conjunction with the phrase "criteria established by the Secretary," stating that "a medical service or technology will be considered a 'new medical service or technology' if the service or technology meets *criteria established by the Secretary after notice and an opportunity for public comment*." *Id.* § 1395ww(d)(5)(K)(vi) (emphasis added); *see also id.* § 12147(b)(1) (2000) (defining as discrimination in Americans with Disabilities Act a public entity's failure in public transportation "to make key stations (as determined under *criteria established by the Secretary by regulation*)" accessible to individuals with disabilities) (emphasis added). In contrast, the statutory provision concerning undue hardship waivers contains no comparable regulatory directive.

An analysis of the Medicaid statute as a whole only bolsters our conclusion that the Secretary and his delegates have been granted at least the usual leeway to develop criteria through adjudication. The Medicaid statute provides in mandatory terms that states "shall establish procedures" under which they will waive application of the estate recovery rules "if such application would work an undue hardship as determined on the basis of criteria established by the Secretary." *Id.* § 1396p(b)(3). Under West Virginia's reading, this provision would command states to do the impossible before the Secretary issued regulations, requiring them to establish hardship waivers while permitting them to do so only in accordance with yet-to-be-issued criteria. We think, however, the most logical inference from the difficulties created by West Virginia's reading is to reinforce the meaning to which all other indicators point: the "criteria" required by the statute need not be established through a time-consuming notice-and-comment process that the statute nowhere mentions.[2]

IV.

A.

We turn now to whether the Secretary's rejection of West Virginia's proposed amendment was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Overton Park*, 401 U.S. at 416. "To make this finding the court must consider whether the decision was based on a consider-

---

[2]Our conclusion that the statute does not require notice-and-comment rulemaking is fatal to West Virginia's claim that the State Medicaid Manual provision concerning hardship waivers was a substantive rule in interpretative clothing. West Virginia's attack on the manual provision collapses into its argument that the Secretary was required to act through notice-and-comment rulemaking, relying upon the premise that "in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action." *Am. Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993). In all events, the manual provision goes out of its way to emphasize that it does not bind the states to any mandatory requirements beyond those in the Medicaid statute but merely provides guidance as to the agency's construction of the law.

ation of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416. The scope of this review is "narrow," and we must not substitute our judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). We ask, however, whether "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Insofar as West Virginia disputes the Secretary's construction of the Medicaid statute that he administers, we also view the challenge through the lens of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The Medicaid statute is a prototypical "complex and highly technical regulatory program" benefitting from expert administration, which makes deference particularly warranted. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

The administrative process through which state plan amendments are considered also counsels deference. CMS regional staff review state plans and proposed amendments, discuss concerns with the Medicaid agency, and consult with central office staff on questions of federal policy. 42 C.F.R. § 430.14 (2005). The administrative process for plan amendments gives a state "opportunities to petition for reconsideration, brief its arguments, be heard at a formal hearing, receive reasoned decisions at multiple levels of review, and submit exceptions to those decisions." *Alaska Dep't of Health & Soc. Servs.*, 424 F.3d at 939; *see also* 42 C.F.R. § 430.18 (2005). Recognizing the mechanisms for evaluation of amendments at the agency level, "[w]e take care not lightly to disrupt the informed judgments of those who must labor daily in the minefield of often arcane policy, especially given the substantive complexities of the Medicaid statute." *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002).

Courts, therefore, have rightly granted *Chevron* deference to agency interpretations of statutes in the context of state plan amendment disapprovals. *Alaska Dep't of Health & Soc. Servs.*, 424 F.3d at 939 (affording *Chevron* deference in context of agency disapproval of

Medicaid state plan amendment); *Texas v. U.S. Dep't of Health & Human Servs.*, 61 F.3d 438, 440 (5th Cir. 1995) (same); *Georgia v. Shalala*, 8 F.3d 1565, 1566-68 (11th Cir. 1993) (same); *New York v. Sullivan*, 894 F.2d 20, 24 (2d Cir. 1990) (same). We find ample reason to defer in the context of this particular provision of the Medicaid statute, because the undue hardship language does not merely delegate implicitly through the use of ambiguous terms, but rather explicitly calls for administrative action to narrow its meaning.

B.

The Secretary did not act arbitrarily or capriciously, or interpret the Medicaid statute in an unreasonable fashion, when he disapproved West Virginia's proposed "undue hardship" waiver. The agency considered a variety of evidence concerning West Virginia's plan to exempt from estate recovery any homestead property up to the state-wide mean appraised value of a home — which was more than $50,000 at the time of the disapproval. The agency requested data on the cost that West Virginia incurred for estate recoveries, the market value of homes in West Virginia, and the average value of estates to which exemptions would apply.

The data before CMS established that the impact of West Virginia's proposed exemption would vary significantly from county to county. About 3.9 percent of homes in Jefferson County were valued below $50,000, on one end of the spectrum, while more than 83 percent of homes in McDowell County were valued below $50,000 on the other end of the spectrum. West Virginia argued this disparity reflected the relative wealth of its counties, and the Secretary does not dispute that, for example, McDowell County is significantly poorer than Jefferson County. But the disparate impact may also indicate, as the Secretary emphasizes, that a single figure cannot capture the meaning of a homestead of "modest value" throughout West Virginia. Real-estate markets may vary dramatically within any given state. In some markets a great deal less may buy a great deal more home than in others. The Secretary was not statutorily precluded from taking such variations into account, or from requesting that West Virginia set a threshold for modest value using more refined data, as other states have done.

Most critically, the Secretary's disapproval emphasized the amendment's significant overbreadth. We find nothing arbitrary or capricious about the Secretary's conclusion that West Virginia's waiver was so broad that it would serve not as an exception to estate recovery for hardship cases but as a means of unraveling the estate recovery mandate itself. What has been represented as a hardship exemption for "homesteads of modest value" would apply to *every* homestead, regardless of value, and without any means-testing of the recipients. It was not a clear error of judgment for the Secretary to conclude that a provision this broad sweeps beyond cases of "undue hardship" and "sets threshold levels for the market value of a 'homestead of modest value' so as to negate the intent of the estate recovery program" that Congress enacted.

Indeed, West Virginia does not direct us to data that the Secretary ought to have considered, data upon which the Secretary impermissibly relied, or considerations that the Secretary erroneously neglected. The state's argument instead amounts to a claim that the "undue hardship" provision itself required the Secretary to approve its proposed amendment. The House Budget Committee Report stating that Congress intended the Secretary to establish criteria allowing waivers for homesteads of "modest value" is the strongest basis for such a claim, but the report cannot bear the weight that the state's argument places upon it. Given that homesteads of modest value are not mentioned in the statute, we are hard-pressed to conclude that Congress intended that the Secretary must approve a hardship waiver applicable to all homesteads, even those of enormous value. *See Chevron*, 467 U.S. at 842-43. The unambiguous command of the "undue hardship" provision is in fact one of deference to those charged with administering the statute: It authorizes states to establish procedures to waive estate recovery only "if such application would work an undue hardship as determined *on the basis of criteria established by the Secretary*." 42 U.S.C. § 1396p(b)(3) (emphasis added).

Further, the Secretary's construction of undue hardship "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by statute." *Chevron*, 467 U.S. at 845 (internal quotations omitted). Simply put, while the statute and its accompanying history provide support for exempting homesteads of modest value, they do not require that the Secretary approve hardship

exceptions for homesteads of any value. Federal administrators may be empowered to approve a broad waiver as an exercise of the statute's delegated authority, but the interpretation of undue hardship as excluding West Virginia's proposal was certainly a reasonable construction of statutory terms over which Congress had delegated interpretive authority.

## V.

West Virginia has long argued against estate recovery and continues to do so here. It argues that estate recoveries can lead needy citizens to turn down necessary medical care out of fear that they will lose homes in which they take enormous pride. We do not for a moment discount these concerns, nor do we discount the federal government's desire to recoup some small portion of the Medicaid program's staggering costs. Congress has created a place to balance such interests in its statutory scheme, however, and that place is not primarily in the federal courts. The hardship waiver provision entrusts the Secretary with developing criteria that still allow some latitude and flexibility in estate recovery plans from state to state. The latitude is limited, however, by Congress' intention to have an estate recovery program in more than name only. We find no basis to conclude that the Secretary or his delegates exceeded their authority, failed to follow procedures required by law, or acted arbitrarily and capriciously in disapproving West Virginia's hardship waiver amendment. Since "the Administrator's interpretation represents a reasonable accommodation of manifestly competing interests and is entitled to deference," *id.* at 865, we will not usurp the power that Congress provided the Secretary to make the difficult choices involved in this case.

*AFFIRMED*