Filed:  October 23, 2008

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 07-1512
(SPA-05-06)


THE MARYLAND DEPARTMENT OF HEALTH AND MENTAL HYGIENE,

         Petitioner,

    v.

CENTERS FOR MEDICARE AND MEDICAID SERVICES,

         Respondent.

--------------------

NATIONAL ACADEMY OF ELDER LAW ATTORNEYS,

         Amicus Supporting Respondent.


O R D E R


    The court amends its opinion filed September 25, 2008, as follows:

    On page 4, line 2 of footnote 4, the figure "93,000,000.00" is corrected to read "23,000,000.00."

                              For the Court - By Direction


                                   /s/ Patricia S. Connor

                                   Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE MARYLAND DEPARTMENT OF
HEALTH AND MENTAL HYGIENE,
*Petitioner,*

v.

CENTERS FOR MEDICARE AND
MEDICAID SERVICES,
*Respondent.*

⎫
⎪
⎪
⎬   No. 07-1512
⎪
⎪
⎭

NATIONAL ACADEMY OF ELDER LAW
ATTORNEYS,
*Amicus Supporting Respondent.*

On Petition for Review of an Order of the
United States Department of Health & Human Services.
(SPA-05-06)

Argued: March 20, 2008

Decided: September 25, 2008

Before MICHAEL and MOTZ, Circuit Judges, and
Irene M. KEELEY, United States District Judge for the
Northern District of West Virginia, sitting by designation.

Petition for review denied by published opinion. Judge Keeley wrote the opinion, in which Judge Michael and Judge Motz joined.

**COUNSEL**

**ARGUED:** Kathleen Evelyn Wherthey, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Petitioner. Noreen Cornelia O'Grady, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, Office of General Counsel, Philadelphia, Pennsylvania, for Respondent. **ON BRIEF:** Douglas F. Gansler, Attorney General of Maryland, Lorie A. Mayorga, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Petitioner. James C. Newman, Chief Counsel, Region III, UNITED STATES DEPARTMENT OF HEALTH & HUMAN SERVICES, Office of General Counsel, Philadelphia, Pennsylvania, for Respondent. Ron M. Landsman, Rockville, Maryland; Cyril V. Smith, ZUCKERMAN SPAEDER, L.L.P., Baltimore, Maryland, for Amicus Supporting Respondent.

---

**OPINION**

KEELEY, District Judge:

In this case, we consider the Maryland Department of Health & Mental Hygiene's ("Maryland") petition for review of a final decision of the Centers for Medicare & Medicaid Services ("CMS")[1] that disapproved an amendment to Maryland's State Medicaid Plan (the "SPA"). That SPA sought to eliminate deductions for uncovered medical expenses Medicaid recipients incurred before becoming eligible for benefits. Maryland's petition asserts that CMS's rejection of its SPA is

---

[1]Throughout this opinion we refer to both the Centers for Medicare & Medicaid Services and its predecessor, the Health Care Financing Administration ("HCFA"), as CMS. CMS replaced HCFA on July 1, 2001 and is the component of the Department of Health and Human Services that oversees the Medicaid program.

based on an unreasonable interpretation of congressional intent regarding the calculation of a recipient's post-eligibility income and violates Medicaid's policy requiring medically needy recipients to contribute to the cost of their care. We have jurisdiction pursuant to 42 U.S.C. §§ 1316(a)(3) and (b), and § 1396(c). Finding no error, we deny Maryland's petition for review and uphold CMS's decision.

I.

Through the Medicaid program, Congress extended medical assistance to unserved, low-income individuals and families. *See* Social Security Amendments of 1965, Title XIX, Pub. L. No. 89-97, 79 Stat. 286, 343-353 (codified as amended at 42 U.S.C. § 1396a (2006))(the "Medicaid statute"). As part of that program, states provide payment for certain medical and nursing home expenditures using a mix of federal and state funds. As the federal agency charged with providing program oversight, CMS promulgates rules that state Medicaid agencies must follow.

The dispute between CMS and Maryland involves two interpretations of 42 U.S.C. § 1396a(r)(1)(A)(2006), which in part provides that "with respect to the post-eligibility treatment of income for individuals who are institutionalized . . . ," states should deduct expenses for "necessary medical or remedial care recognized under State law but not covered under the State plan . . . subject to reasonable limits the State may establish on the amount of these expenses.[2] Pursuant to this statu-

---

[2]Section 1396a(r)(1)(A) reads in full:

(r)(1)(A) For purposes of sections 1396a(a)(17) and 1396r-5(d)(1)(D) of this title and for purposes of a waiver under section 1396n of this title, with respect to the post-eligibility treatment of income of individuals who are institutionalized or receiving home or community-based services under such a waiver the treatment described in subparagraph (B) shall apply, there shall be disregarded reparation payments made by the Federal Republic of

tory language, CMS promulgated regulations requiring states to deduct uncovered but medically necessary expenses that nursing home residents incurred before becoming eligible for Medicaid benefits from the amount of post-eligibility income those residents must contribute to the cost of their nursing home care. 42 C.F.R. § 435.726(c)(4).[3] Maryland contends that deducting these expenses amounts to "a transfer of money from Medicaid to a [recipient's] pocket," and undermines the financial stability of its Medicaid budget.[4] Accordingly, its SPA would "[disallow] as a deduction any amount of medical expenses for dates of service before the retroactive period associated with the effective date of Medical Assistance eligibility." Md. Dep't of Health & Hygiene, Reasonable Limits on Amounts for Necessary Medical or Remedial Care Not Covered Under Medicaid, SPA 05-06 (2004). In effect, Maryland seeks to eliminate from its post-eligibility income calculation all deductions for uncovered medical expenses Medicaid nursing home residents incurred before becoming eligible for benefits.

At issue is the financial well-being of nursing home residents in Maryland who, under Medicaid policy, must contribute to the cost of their care. Should Maryland prevail, its

---

Germany, and there shall be taken into account amounts for incurred expenses for medical or remedial care that are not subject to payment by a third party, including—

(i) medicare and other health insurance premiums, deductibles, or coinsurance, and;

(ii) necessary medical or remedial care recognized under State law but not covered under the State plan under this subchapter, subject to reasonable limits the State may establish on the amount of these expenses.

[3]Although this opinion specifically addresses medical expenses incurred by nursing home residents, we recognize that the policy in question affects all institutionalized Medicaid recipients.

[4]During oral argument, Maryland estimated the annual impact of these regulations on its budget at $23,000,000.00.

financial burden under Medicaid certainly would be reduced. Nursing home residents with incurred medical expenses, however, would no longer be able to use their own funds to pay those bills because the SPA would deprive them of the means to do so.

## II.

Our review of CMS's decision is governed by the Administrative Procedure Act. 5 U.S.C. § 706(2) (2006). We may only "'set aside agency action, findings, and conclusions' when they are found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *West Virginia v. Thompson*, 475 F.3d 204, 209 (4th Cir. 2007) (*quoting* 5 U.S.C. § 706(2)). We may also "set aside agency actions 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right'" or "'without observance of procedure required by law.'" *Id.* (*quoting* 5 U.S.C. § 706(2)(C)-(D)).

We may not, however, "substitute our judgment for that of the agency." *Id.* at 212. We will overrule the agency's decision only if we find that it has failed to consider relevant factors and committed "'a clear error of judgment.'" *Id.* (*quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). In determining whether the agency's action was arbitrary, capricious or an abuse of discretion, we consider whether

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

When CMS's disapproval of an SPA depends on construction of the Medicaid statute, we view that administrative interpretation "through the lens of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)." *West Virginia*, 475 F.3d at 212. *Chevron* requires us to reject administrative constructions that are contrary to clear congressional intent.

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

467 U.S. at 842-43.

We must uphold an agency's permissible construction of a statute and "may not substitute [our] own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844. Moreover, we accord an agency's interpretation "substantial deference" in determining whether its construction is permissible. *Rust v. Sullivan*, 500 U.S. 173, 184 (1991). Nonetheless, where "the [agency's] reasoning couples internal inconsistency with a conscious disregard for the statutory text," we must reject the statutory interpretation. *Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 292 (2006).

We have recently held that deference in the interpretation of the Medicaid statute is "particularly warranted." *West Virginia*, 475 F.3d at 212. In that case we determined that the Secretary's disapproval of a proposed plan amendment by West Virginia did not exceed his authority, and noted that "[t]he Medicaid statute is a prototypical 'complex and highly technical regulatory program' benefitting from expert administration." *Id.* (*quoting Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)). We also stated that "[t]he administra-

tive process through which state plan amendments are considered also counsels deference." *Id.* Moreover,

> [r]ecognizing the mechanisms for evaluation of amendments at the agency level, "[w]e take care not lightly to disrupt the informed judgments of those who must labor daily in the minefield of often arcane policy, especially given the substantive complexities of the Medicaid statute."

*Id.* (*quoting Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002)).

### III.

Because the outcome of this case depends on an understanding of certain "spenddown" and "post-eligibility" provisions of the Medicaid statute, we begin with a brief summary of the history and overarching purpose of those provisions.

### A.

Designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical care, the Medicaid program functions as a partnership between the federal government and the states. 42 U.S.C. § 1396a(a)(10). After a state elects to participate in the program, the federal government shares the costs of providing medical assistance in a ratio that varies from state to state. 42 U.S.C. § 1396a(a)(2). In return, the state agrees to comply with the Medicaid statute and any administrative regulations properly promulgated by CMS. 42 U.S.C. 1396a(a)(1).

Consistent with Medicaid's character as a poverty program, two basic categories of applicants are eligible to receive medical assistance under Medicaid: the "categorically needy" and the "medically needy." 42 U.S.C. § 1396a(a)(10). The categorically needy are applicants whose low income alone quali-

fies them to receive Medicaid benefits. *Id.* By contrast, medically needy applicants have become impoverished through medical expenditures; while they have sufficient income to afford basic living expenses, they cannot afford expensive medical care. *Id.* It is the income of these medically needy applicants that is impacted by Maryland's SPA.

Pursuant to § 1396a(a)(17), Congress has delegated to CMS exceptionally broad authority to promulgate regulations determining the extent of income and resources available to medically needy applicants and recipients.[5] *See* 42 C.F.R. §§ 435.831, 436.831 (2008). Each state, however, is allowed some discretion in determining income limits.

If a medically needy applicant's pre-eligibility income exceeds the Medicaid limit, CMS's regulations direct states to deduct incurred medical expenses in order to reduce that income to the Medicaid eligibility level. § 435.831(d). CMS's regulations term this the "spenddown" process and require states to calculate the amount of "countable income" medically needy applicants must "spenddown" before Medicaid will cover their medical costs. § 435.831.

In order to determine the amount of an applicant's countable income, states first subtract certain standard deductions from gross income. § 435.831(b). If that amount equals or is less than the state income standard, the applicant is deemed eligible for Medicaid benefits. § 435.831(c). If that amount exceeds the state income standard, however, the applicant may become eligible for benefits by "spending down" incurred medical expenses to meet the state eligibility standard. § 435.831(d).

---

[5]§ 1396a(a)(17) in pertinent part provides ". . . for flexibility in the application of such standards with respect to income by taking into account, *except to the extent prescribed by the Secretary*, the costs . . . incurred for medical care or for any other type of remedial care recognized under State law[.]" (Emphasis added).

As defined by CMS' regulations governing the spenddown process, "incurred medical expenses" are any medically necessary expenses for which an applicant would otherwise be liable. § 435.831. CMS requires states to deduct expenses that the applicant is repaying either at the time of application or that were incurred within three months prior to the filing of the application. § 435.831(f).[6] Although states may choose to deduct more bills, CMS does not require them to do so. § 435.831(g). Upon successful completion of the spenddown process, medically needy applicants are eligible to receive Medicaid benefits, such as nursing home care.

## B.

Medicaid pays room and board costs for eligible nursing home residents through the nursing home *per diem* rate. § 413.53. This is a specific payment per day that nursing homes agree to accept from Medicaid as full payment for providing care. *Id.*

CMS requires nursing home residents with income remaining after the completion of the spenddown process to contribute that income to the nursing home to defray the cost of their care to the extent possible. § 435.725(a). In order to determine the amount of income a resident has available after eligibility, states calculate an amount CMS's regulations term the "post-eligibility contribution to care." §§ 435.725, 435.726.

States calculate this amount by undertaking a process similar to the spenddown process. First, they determine a nursing home resident's total income, including income disregarded during the spenddown process. § 435.726(c). They then subtract from that total any incurred medical expenses deducted

---

[6]This three-month period in CMS's regulations is drawn from a requirement in the Medicaid statute that allow applicants to qualify for benefits retroactively for a three-month period prior to application. 42 U.S.C. 1396a(a)(34).

during spenddown. If a resident has available income remaining, CMS assumes the resident will use it to defray room and board costs and directs states to subtract that amount from Medicaid's payment to the nursing home. § 435.725(a). Thus, during the post-eligibility process, CMS's regulations require states to deduct incurred medical expenses in the same manner as they deducted those expenses during the spenddown process. It is this requirement of consistent treatment of deductions that Maryland contends is unreasonable and violative of Medicaid policy.

## C.

The portion of the Medicaid statute governing the calculation of post-eligibility income is found at 42 U.S.C. § 1396a(r)(1)(A). By longstanding policy predating the enactment of that statute, CMS had mandated consistent deduction of incurred medical expenses in both the spenddown and post-eligibility processes. §§ 435.726(c), 435.831(c)(ii) (1987); 43 Fed. Reg. 45,176-01, 45,212-45,213 (Sept. 29, 1978). CMS's regulations governing each were extremely similar. Both required the agency to deduct

> [a]mounts for incurred expenses for medical or remedial care that are not subject to payment by a third party, including—
>
> . . .
>
> (ii) Necessary medical or remedial care recognized under State law but not covered under the State's Medicaid plan, subject to reasonable limits the agency may establish on amounts of these expenses.

§ 435.726(c)(4) (1987); *See* § 435.831(c)(ii) (1987).

States were unhappy with these regulations, and complained that they were inflexible and burdensome. 53 Fed.

Reg. 3586-01, 3586 (Feb. 8, 1988); 50 Fed. Reg. 10992-01, 10993 (Mar. 19, 1985). They also contended that, by requiring states to deduct uncovered medical expenses incurred before Medicaid eligibility, CMS was unfairly subsidizing services not covered under state Medicaid plans while reducing the amount nursing home residents were obligated to contribute to the cost of their care. 53 Fed. Reg. at 3586.

CMS addressed these concerns by undertaking a lengthy review of its post-eligibility rules in 1985. 50 Fed. Reg. at 10993. Eventually, in February 1988, it announced its intent to amend those rules to allow states "maximum flexibility" in deciding whether to limit, or eliminate entirely, deductions for incurred medical expenses when calculating a nursing home resident's post-eligibility income. 53 Fed. Reg. at 3586.

This amendment, which became effective on April 8, 1988, amounted to a substantial change to CMS's traditional policy of requiring consistent treatment of deductions for incurred medical expenses. As CMS explained, under its new rule "[s]ervices furnished to an individual during a period of ineligibility are services not covered under the State plan." *Id.* at 3589. Thus, "the State is not required to deduct medical expenses for services furnished during a period of ineligibility" from its post-eligibility income calculation. *Id.*

Congress' reaction was swift and negative. In July 1988, it enacted 42 U.S.C. § 1396a(r)(1)(A),[7] which incorporated in whole CMS's prior regulatory language regarding the post-eligibility treatment of incurred medical expenses. Congress also made § 1396a(r)(1)(A) retroactive to April 8, 1988.[8]

---

[7]42 U.S.C. 1396a(r)(1)(A) is part of the Medicare Catastrophic Coverage Act of 1988, Pub. L. No. 100-360, § 303(d), 102 Stat. 683.

[8]"The amendment made by subsection (d) [§ 1396a(r)(1)(A)] is effective on and after April 8, 1988. The final rule [CMS] published on February 8, 1988 (53 Federal Register 3586) is superseded to the extent inconsistent with the amendment made by subsection (d)." Medicare Catastrophic Coverage Act, § 303(g)(4) (citations omitted).

A House Conference Report commenting on § 1396a(r)(1)(A) recognized that, until February 1988, CMS's longstanding policy had required states to deduct uncovered medical expenses from the income of nursing home residents before calculating their post-eligibility contribution to care. H.R. Rep. No. 100-661, at 266 (1988) (Conf. Rep.), *as reprinted in* 1988 U.S.C.C.A.N. 923, 1044. Noting that CMS's amendment permitted states to substantially reduce or eliminate this deduction, the Report stated that Congress' avowed purpose in enacting § 1396a(r)(1)(A) was to "reinstate" CMS's prior rule. *Id.*

Consistent with that prior rule, § 1396a(r)(1)(A) allowed states to set "reasonable limits" on the age of incurred medical expenses to be deducted post-eligibility. § 435.726(c)(4) (1987). It did not, however, define the contours of such limits or state explicitly whether they were subject to CMS's approval. Nevertheless, the House Conference Report emphasized that any limits "must ensure that nursing home residents are able to use their own funds to purchase necessary medical or remedial care not covered by the State Medicaid program, while minimizing opportunities for providers to take financial advantage of either the program or the residents." H.R. Rep. No. 100-661, at 266.

Following the enactment of § 1396a(r)(1)(A), CMS promulgated guidelines in its State Medicaid Manual subjecting the states' discretion to define "reasonable limits" to CMS's review. *Id.* Those guidelines directed states to:

> [d]educt from the individual's total income amounts for incurred expenses for medical or remedial care that are not subject to payment by a third party, including:
>
>    . . .
>
>    o  Necessary medical or remedial care recognized under State law but not covered

under the State plan, subject to reasonable limits the agency may establish on amounts of these expenses.

Reasonable limits (if any) must be submitted by you for approval by [CMS] in the Medicaid State plan. The reasonable limits must ensure that institutionalized individuals be able to use their own funds to purchase necessary medical or remedial care not covered by the Medicaid program, while minimizing opportunities for providers to take financial advantage of either the Medicaid program or the individuals.

State Medicaid Manual § 3703.8 (1989).[9] Consequently, while states could propose limits on post-eligibility deductions of incurred medical expenses, consistent with its prior rule CMS reserved the power to review those proposals for reasonableness on a case-by-case basis.

## IV.

Within this historical and regulatory context, we turn now to CMS's disapproval of Maryland's SPA. During the administrative process, Maryland argued that § 1396a(r)(1)(A) does not require states to treat deductions for incurred medical expenses consistently. It contended that CMS's regulations requiring consistent treatment actually undermined Medicaid's purpose of assisting the truly needy by creating a "loophole" that subsidized uncovered medical care for people with income. It also asserted that those regulations unreasonably contravened clearly articulated congressional policy requiring medically needy recipients to contribute to the cost of their care. Maryland relied heavily on comments regarding § 1396a(r)(1)(A) in the House Conference Report to support its contention that (1) CMS lacks the authority to prohibit a

---

[9]Section 3703.8 has not been amended since 1989.

state from imposing income limits the state believes are reasonable, and (2) Congress has forbidden consistent treatment of deductions for incurred medical expenses in the spenddown and post-eligibility processes.

Following a full procedural review,[10] CMS disapproved Maryland's SPA, finding it would unreasonably limit deductions for incurred medical expenses in the post-eligibility process, violate CMS's rule requiring consistent treatment of these deductions, and violate Medicaid policy by depriving medically needy nursing home residents of income needed to pay uncovered medical expenses. It based its disapproval on its authority under 42 U.S.C. § 1396a(a)(17) to promulgate rules governing the states' management of the spenddown and post-eligibility processes. Decision of the Administrator, *In re: The Disapproval of the Maryland State Plan Amendment 05-06*, 5, 9-10.

CMS's final decision pointed to its long-standing policy requiring states to treat incurred medical expenses "not covered under the State plan" consistently in both the spenddown and post-eligibility processes. § 435.726(c)(4), 435.831(c)(ii). Noting that Congress had been aware of that requirement when it enacted § 1396a(r)(1)(A) and had allowed it to stand, CMS pointed out that it has traditionally regarded medical services provided during a period of ineligibility as services "not covered under the State plan." Further, it stated that, except for a brief three-month period in 1988, it has always required states to deduct expenses for these services from a recipient's post-eligibility income. § 435.726(c)(4)(ii)(2008); § 435.726(c)(4)(ii) (1987). CMS reasoned that, by incorporating the phrase "not covered under the State plan" verbatim from CMS's regulation into the text of § 1396a(1)(r)(A), Con-

---

[10]Because Maryland has not argued that the administrative process before CMS was procedurally unfair, we limit our review to the substance of CMS's decision and need not address the procedure used to reach that decision.

gress also ratified CMS's interpretation of that phrase. Decision of the Administrator, *In re: The Disapproval of the Maryland State Plan Amendment* 05-06, 8.

Additionally, CMS justified the reasonableness of its regulatory scheme on two grounds. First, unlike Maryland's amendment, its regulations requiring consistent treatment of deductions of incurred medical expenses furthered the intent of Congress expressed in § 1396a(r)(1)(A) "to afford an institutionalized individual with income the ability to actually pay non-covered medical expenses for medical and remedial care." 70 Fed. Reg. 48155-02, 48,156, 48,157 (Aug. 16, 2005). Second, Maryland's SPA actually undercut congressional policy expressed in § 1396a(a)(17) that medically needy residents should pay their uncovered medical bills to the extent possible. *Id.*

## V.

To determine whether CMS properly rejected Maryland's SPA, we direct our inquiry first to whether CMS's interpretation exceeds its regulatory authority or is otherwise impermissible. *West Virginia*, 475 F.3d at 209. We also examine whether its interpretation is unambiguously rejected by the plain language of § 1396a(r)(1)(A). *See Cetto v. LaSalle Bank Nat'l Ass'n*, 518 F.3d 263, 274 (4th Cir. 2008). We conclude that neither of these circumstances exists.

## A.

Section 1396a(a)(17) of the Medicaid statute outlines congressional policy regarding the states' responsibilities for determining Medicaid eligibility. There Congress commands states to "include reasonable standards . . . in accordance with standards prescribed *by the Secretary*." *Id.* (Emphasis added). Significantly, that statute also limits the authority of the states to specifically calculate income. States must

provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed *by the Secretary*, available to the applicant or recipient . . . and provide for flexibility in the application of such standards with respect to income by taking into account, except to the extent prescribed *by the Secretary*, the costs . . . incurred for medical care . . . .

*Id.* (Emphasis added).

It is the Secretary therefore, not the states, to whom Congress has explicitly delegated the authority to prescribe the standards for determining eligibility, available income, and deductions for medical expenses. We thus conclude that, in promulgating regulations for states to follow in calculating the post-eligibility income of nursing home residents, CMS has not clearly exceeded its authority.

### B.

We next determine whether the portions of the Medicaid statute relating to deductions for uncovered medical expenses use ambiguous terms. *Chevron*, 467 U.S. at 842-43. If not, we apply the statute's plain language. *Id.*; *Cetto*, 518 F.3d at 274. If an ambiguity does exist, however, we will not substitute our own construction of the statute, *Chevron*, 467 U.S. at 844, but must instead determine whether CMS's interpretation is reasonable and entitled to substantial deference. *Rust*, 500 U.S. at 184.

We have already noted that § 1396a(a)(17) unambiguously authorizes CMS to promulgate regulations to determine a Medicaid applicant's available income. Regarding the calculation of post-eligibility income, § 1396a(r)(1)(A) unambiguously commands states to take into account "medical care recognized under State law but not covered under the State plan." It does not, however, define the phrase "not covered

under the State plan." CMS has traditionally interpreted that phrase to refer to medical services a recipient obtained prior to Medicaid eligibility, that is any medical service not paid for by Medicaid. As we have already noted, this interpretation is consistent with CMS's longstanding interpretation of the phrase as used in its regulations governing the spenddown process. *See* 59 Fed. Reg. 1659-01, 1671 (Jan. 12, 1994); 53 Fed. Reg. at 3588, 3590.

Although Maryland does not challenge CMS's interpretation of the phrase as used in the spenddown process, it argues that, in § 1396a(r)(1)(A), "not covered under the State plan" refers to medical care excluded by the Medicaid program, in other words, medical services that Medicaid never covers and for which it never pays. Relying heavily on the House Conference Report, Maryland contends that, in the post-eligibility process, states may impose any limit they deem reasonable on deductions for incurred medical expenses without obtaining prior approval from CMS. Further, it contends that § 1396a(r)(1)(A) actually prohibits consistent treatment of such deductions in the spenddown and post-eligibility processes.

## C.

Because we find that the phrase "not covered under the State plan" is "susceptible to more precise definition and open to varying constructions," we must determine whether CMS's interpretation is reasonable. *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) (noting that, when Congress properly delegates authority to an agency, the agency's interpretation of an ambiguous statutory phrase "often demands *Chevron* deference"). By failing to define the phrase, Congress left an interpretive gap that CMS may fill. *Chevron*, 467 U.S. at 843-44. CMS's interpretation properly fills that gap by requiring nursing home residents to contribute to the cost of their care while still allowing them to pay any necessary medical expenses not covered by Medicaid. This result comports with the broadly

stated goals of the Medicaid statute, as well as Congress' incorporation of CMS's traditional interpretation of the phrase when it enacted § 1396a(r)(1)(A).

Maryland's contention that Congress "unequivocally rejected" CMS's traditional interpretation of "not covered under the State plan" when it enacted § 1396a(r)(1)(A) is not supported by the statute's legislative history. Although Maryland argues that statements in the House Conference Report authorize states to establish reasonable limits on post-eligibility deductions unimpeded by CMS's oversight, a careful reading of that Report belies Maryland's interpretation. In pertinent part, the House Conference Report states:

> *As under the previous regulation, States will have the ability to place "reasonable limits" on a resident's expenditures for medical or remedial care.*
>
> . . .
>
> For example, it would be reasonable for a State to provide that only uncovered services prescribed by a physician may be deducted. It would also be reasonable for States to impose specific dollar limits for specific services or items, provided that these limits reflect annual increases in the cost of medical care services and supplies.
>
> . . .
>
> In providing these examples of "reasonable limits for deducting of medical expenses incurred by nursing home residents, *the conferees do not intend any approval of comparable limits in the "spenddown" process for medically needy programs.* However, it would not be reasonable for States to set an overall dollar limit, such as $50 per month, for all non-covered services. Similarly, it would not be reason-

able for States to impose a limit on the number of medically necessary services or items that an individual could deduct in any one month.

H.R. Rep. No. 100-661, at 266 (Emphasis added). These statements merely provide guidance about reasonable limits on deductions that a state might consider; they do not authorize states to impose any limits they choose on post-eligibility deductions. Nor do they forbid consistent treatment of these deductions in the spenddown and post-eligibility processes.

While Maryland notes correctly that § 1396a(r)(1)(A) permits states to impose "reasonable limits" on deductions of incurred medical expenses, it ignores § 1396a(a)(17)'s explicit delegation of authority to CMS to establish income standards for the Medicaid program. When these two statutes are read *in pari materia*, they neither strip CMS of its authority to regulate the post-eligibility process nor authorize states to exclude deductions for uncovered medical expenses without obtaining prior approval from CMS.

Further, the House Conference Report's use of examples of "reasonable limits" on deductions, and its comment that "the conferees do not intend any approval of comparable limits in the 'spenddown' process for medically needy programs," in no way prohibit CMS from requiring states to treat deductions for incurred medical expenses consistently in the spenddown and post-eligibility processes. At most, the Report's comment and examples illustrate how Congress, by not specifically deciding an issue, delegated the decision to the administrative agency.

D.

Ultimately, we are not the arbiter of whether Maryland or CMS has correctly interpreted § 1396a(r)(1)(A). We may only uphold the SPA if the relevant statutory language unambiguously favors Maryland's interpretation. *Cetto*, 518 F.3d at

274; *see Chevron*, 467 U.S. at 842-43. We conclude that it does not.

Prior to April 1988, CMS had interpreted the phrase "not covered under the State plan" to include medical services for which Medicaid does not pay, and had required states to deduct expenses for such services consistently in both the spenddown and post-eligibility processes. *See* 50 Fed. Reg. at 10993. Congress allowed that traditional interpretation to stand without intervention until CMS amended its regulations to permit states "maximum flexibility" to limit or eliminate those deductions in the post-eligibility process. *Id.* Congress effectively overturned that amendment by incorporating CMS's prior rule verbatim into the text of § 1396a(r)(1)(A) and making that statute retroactive to the effective date of CMS's new rule. By doing so, it foreclosed any possibility that states could limit or eliminate post-eligibility deductions for incurred medical expenses without CMS's prior approval.

We reject Maryland's argument that the legislative history of § 1396a(r)(1)(A) supports the conclusion that CMS's regulatory scheme is unreasonable. Nowhere does the House Conference Report state that by enacting § 1396a(r)(1)(A) Congress intended to prohibit a policy requiring consistent treatment of incurred medical expenses in the spenddown and post-eligibility processes. To the contrary, although Congress has twice amended § 1396a(r)(1)(A) since first enacting it in 1988, it has left intact CMS's longstanding policy requiring consistent treatment of deductions.[11] This comports with the comment in the House Conference Report that, by enacting § 1396a(r)(1)(A), Congress intended to "reinstate" CMS's prior rule.

---

[11]*See* Balanced Budget Act of 1997: Medicaid Payment Rates for Certain Medicare Cost-Sharing, Pub. L. No. 105-33, § 4714, 111 Stat. 251, 509-10 (1997); Omnibus Budget Reconciliation Act of 1990: Disregarding German Reparation Payments from Post-Eligibility Treatment of Income Under the Medicaid Program, Pub. L. No. 101-508, § 4715, 104 Stat. 1388 (1990).

Nor does § 1396a(r)(1)(A) cede to the states the sole authority to determine reasonable limits on deductions for incurred medical expenses. Congress' silence on that issue left the decision about how to treat such deductions to CMS. *Chevron*, 467 U.S. at 843-44. We therefore agree with CMS that its interpretation of the phrase "not covered under the State plan" is reasonable. *Id.*

## VI.

In conclusion, 42 U.S.C. § 1396a(a)(17) unambiguously confers on the Secretary the power to "stand[ ] in the shoes of Congress" and interpret the Medicaid statute. *A.T. Massey Coal Co. v. Holland*, 472 F.3d 148, 166 (4th Cir. 2006) (*citing United States v. Mead Corp.*, 533 U.S. 218, 229-30 (2001)).[12] Moreover, CMS has not clearly exceeded its authority in promulgating its post-eligibility income regulations. Further, CMS's traditional interpretation of the phrase "not covered under the State plan" is reasonable in light of Congress' expressed policy permitting nursing home residents to pay down medical expenses incurred prior to Medicaid eligibility, as well as the clear purpose of the Medicaid statute to provide medical services to low-income recipients.

We need not pass judgment on the merits of the parties' competing policy arguments, nor decide whether CMS's interpretation of "not covered under the State plan" reflects the true intent of Congress. Our review is restricted solely to a determination that, in its interpretation, CMS has neither exceeded its administrative authority nor clearly erred in its judgment. *West Virginia*, 475 F.3d at 209, 212. Thus, even if we agreed that Maryland's SPA is more reasonable, CMS would still prevail because we must defer to its interpretation so long as it is reasonable. *Chevron*, 46 U.S. at 843-44.

---

[12]In *A.T. Massey Coal Co.*, we recognized that when an agency's decisions and procedures resemble those of the legislature "the agency stands in the shoes of Congress, and its decisions carry the force of law." 472 F.3d at 166.

CMS's requirement that states deduct uncovered medical expenses incurred before Medicaid eligibility from a nursing home resident's post-eligibility contribution to care is a reasonable interpretation of Congress' intent in enacting § 1396a(r)(1)(A). It does not "couple[ ] internal inconsistency with a conscious disregard for the statutory text." *Arkansas*, 547 U.S. at 292. In accord with the reasonableness of that interpretation and the "substantial deference" we afford to the authorizing agency, *Rust*, 500 U.S. at 184, we therefore uphold CMS's interpretation as a permissible construction of the statute. *Chevron*, 467 U.S. at 843.

## VII.

Accordingly, we deny Maryland's petition for review and uphold the decision of the Administrator of the Centers for Medicare & Medicaid Services.

*PETITION FOR REVIEW DENIED*