**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 20-2173**

_____

NEW RIVER ELECTRICAL CORPORATION,

Petitioner,

v.

OCCUPATIONAL SAFETY & HEALTH REVIEW COMMISSION,

Respondent.

_____

On Petition for Review of an Order of the Occupational Safety and Health Review Commission. (18-0523)

_____

Argued: October 28, 2021                                  Decided: February 1, 2022

_____

Before DIAZ and THACKER, Circuit Judges, and Thomas T. CULLEN, United States District Judge for the Western District of Virginia, sitting by designation.

_____

Reversed and remanded by published opinion. Judge Cullen wrote the opinion, in which Judge Diaz and Judge Thacker joined.

_____

**ARGUED:** Keith Louis Pryatel, HANELINE PRYATEL LAW, Hudson, Ohio, for Petitioner. Jin Young Chong, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent. **ON BRIEF:** Elena S. Goldstein, Deputy Solicitor, Edmund C. Baird, Associate Solicitor for Occupational Safety and Health, Heather R. Phillips, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent.

_____

CULLEN, District Judge:

In November 2017, Eric Marsh, an employee of Petitioner New River Electrical Corporation ("New River"), suffered severe burns when he picked up a live electrical wire at a job site. The Occupational Safety and Health Administration ("OSHA") investigated the accident, determined that New River committed three serious violations of the applicable safety regulations, and fined the company $38,802. New River appealed that determination. An Administrative Law Judge ("ALJ") affirmed OSHA's decision, although he decreased the penalty to $12,934. The Occupational Safety and Health Review Commission ("the Commission") declined to review the ALJ's decision and it became a final order. New River now seeks review of that final order.

Because we conclude that the ALJ improperly relieved the Secretary of his[1] burden of proving that New River had constructive knowledge of these violations as part of his *prima facie* case, we reverse the Commission's order and remand for further proceedings.

I.

A.

New River is an electrical construction contractor headquartered in Cloverdale, Virginia, with an office in Westerville, Ohio. On November 6, 2017, New River was completing the final stages of an underground cable replacement project in Madison Mills, a residential subdivision in Columbus, Ohio. The crews were scheduled to work under a

---

[1] The Honorable Martin J. Walsh is the current Secretary of the Department of Labor and, as such, this opinion uses masculine pronouns throughout to refer to "the Secretary."

2

planned power outage from 9:00 a.m. to 3:00 p.m. and were planning to recable over 30 transformers. American Electric Power ("AEP"), who hired New River to complete this project, deenergized the electrical lines in Madison Mills starting at 9:00 a.m. that day.

Three New River crews worked at the Madison Mills site that day: two Underground Residential Division crews ("URD crews") and one Overhead Riser crew ("Riser crew"). Foremen Zack Howard and Mark Bail each led a URD crew, and Foreman Jim Castle led the Riser crew. It was Foreman Bail's first day working as a supervisor.

After AEP deenergized the lines, the three foremen met to discuss the work they would perform that day. Then, together with their respective crews, they prepared a Job Site Assessment and a Job Hazard Analysis. In creating those documents, New River expects its foremen to "assess[] all the risks, assess[] what can be done to prevent those risks, reduce[] those risks and assessments to writing, and review[] and sign[] the [document]." J.A. 88–89. Those documents identified "flashes" and "electrical shock" as risks presented by the Madison Mills project. *See* J.A. 765. New River's standard procedures required its employees to test, tag,[2] and ground all transformers before replacing or recabling them. This safety precaution is specifically intended to prevent accidental electrical shocks.

---

[2] "Tags are essentially warning devices" that are "affixed" to parts of electrical energy systems at a job site and signal to other crew members where employees are working "to prevent . . . the unexpected or unplanned energizing of an electrical line or device." J.A. 483, 489.

3

Eric Marsh, a Groundman for New River, worked on the Riser crew on November 6. During the course of his work, Marsh picked up an electrical line that, unbeknownst to him, was still energized. The line shocked Marsh with 7,650 volts of electricity, causing second- and third-degree burns on his body.

As it turns out, no one had tested, tagged, or grounded the transformer connected to the cable that shocked Marsh. When Foremen Howard and Bail learned about Marsh's accident, they attempted to conceal these breaches of New River's standard safety protocols. To cover their tracks, the two foremen grounded and tagged both the transformer connected to the cable that Marsh had worked on and the adjacent one so that electricity would not transfer between the two. During the postaccident investigation, Foremen Howard and Bail falsely reported to Nick Barnhart, New River's Superintendent, that the transformer had been tested, tagged, and grounded prior to Marsh beginning work. At the time, neither Howard nor Bail admitted to altering the scene of the accident. Because it suspected that Howard and Bail were not being truthful during that initial investigation, New River fired both men two days later.

On November 14, Mike Stowell, an OSHA Compliance and Safety Officer, opened a formal investigation into the incident. During that inquiry, Foreman Howard confessed that he and Foreman Bail had manipulated key evidence at the scene of the accident. On February 22, 2018, the Secretary issued a citation and notification of penalty to New River.

The citation alleged violations of three separate OSHA regulations[3] and deemed all three "serious violations."[4] J.A. 18–20. The Secretary assessed a proposed penalty of $38,802—$12,934 per violation—and New River timely filed a notice of contest.

B.

On October 15, 2019, a Commission ALJ conducted a hearing on New River's notice of contest. The Secretary called Foreman Howard, Foreman Bail, and Compliance Officer Stowell as witnesses. Dennis Dawsey, an expert in electrical engineering safety,

---

[3] The first violation was of 29 C.F.R. § 1926.961(b)(4)(ii), which provides: "Each crew shall independently comply with this section and, if there is no system operator in charge of the lines or equipment, shall have separate tags and coordinate deenergizing and reenergizing the lines and equipment with the other crews." The second was of 29 C.F.R. § 1926.961(c)(2), which provides: "The employer shall ensure that all switches, disconnectors, jumpers, taps, and other means through which known sources of electric energy may be supplied to the particular lines and equipment to be deenergized are open. The employer shall render such means inoperable, unless its design does not so permit, and then ensure that such means are tagged to indicate that employees are at work." The third violation was of 29 C.F.R. § 1926.962(b), which provides "For any employee to work transmission and distribution lines or equipment as deenergized, the employer shall ensure that the lines or equipment are deenergized under the provisions of § 1926.961 and shall ensure proper grounding of the lines or equipment as specified in paragraphs (c) through (h) of this section."

[4] The Occupational Safety and Health Act ( the "Act") states that "a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence know of the presence of the violation." 29 U.S.C. § 666(k). The Act requires the Secretary to assess a civil penalty against employers that are cited for serious violations. *See id.* § 666(b) ("Any employer who has received a citation for a serious violation . . . shall be assessed a civil penalty . . . ."); *cf. id.* § 666(c) ("Any employer who has received a citation . . . and such violation is specifically determined not to be of a serious nature, may be assessed a civil penalty . . . .").

5

also testified for the Secretary. The Secretary introduced into evidence the citation and notification of penalty, the OSHA investigation report, and New River's incident report. *See* J.A. 861–911. After the Secretary rested his case, New River called Superintendent Barnhart and two other employees as witnesses. New River introduced into evidence a variety of exhibits including its safety manual, disciplinary records from 2015–2018, the Madison Mills risk assessment, and New River's job site audit evaluations. *See* J.A. 463–752, 765–66, 768–860.

In a written order dated September 11, 2020, the ALJ affirmed all three citations against New River. The ALJ found that the Secretary had proven his *prima facie* case as to each citation and that New River had not established the affirmative defense of "unpreventable employee misconduct." In affirming OSHA's citations, the ALJ noted that all three citation items "were related violations, contributed to the same hazard, and that the abatement was no different for any of the violations." J.A. 127–28. For those reasons the ALJ grouped all three citations into one citation item and assessed a single penalty of $12,934. The Commission did not direct the case for further review, and the ALJ's order became final on October 15, 2020. New River filed this petition for review on October 29, 2020.

## II.

Generally, "judicial review of agency decisions is 'narrow, and we must not substitute our judgment for that of the agency.'" *Putnam Ctr. v. U.S. Dep't of Health & Hum. Serv.*, 770 F. App'x 630, 638 (4th Cir. 2019) (citing *West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007)). A court must give an "agency's interpretation [of its own

6

ambiguous regulation] substantial deference." *Almy v. Sebelius*, 679 F.3d 297, 307 (4th Cir. 2012); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2408 (2019) (describing this deference as "potent").

But Congress specifically designed the Commission as a distinct agency that is not housed under OSHA or the Department of Labor to serve as a "neutral arbiter" of regulatory violations. *See Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 152–55 (1991); *ComTran Grp., Inc. v. U.S. Dep't of Lab.*, 722 F.3d 1304, 1307 (11th Cir. 2013) ("The Secretary has rulemaking power and establishes the safety standards; investigates the employers to ensure compliance; and issues citations and assesses monetary penalties for violations. The Commission, meanwhile, has adjudicative power and serves as a 'neutral arbiter' between the Secretary and cited employers." (citations omitted)). In contrast to traditional, unitary administrative agencies, the Commission does not "possess authoritative interpretive powers" because it does not interpret its *own* regulations. *Martin*, 499 U.S. at 154. Rather, the Commission interprets regulations passed by OSHA and the Department of Labor.

As a result, "we review the Commission's legal conclusions *de novo*, affording deference when appropriate to the Secretary's interpretations [of agency regulations]." *Knox Creek Coal Corp. v. Sec'y of Lab., Mine Safety, & Health Admin.*, 811 F.3d 148, 157 (4th Cir. 2016). We review the Commission's findings of fact under the substantial evidence standard. *See Northrop Grumman Sys. Corp. v. U.S. Dep't of Lab.*, 927 F.3d 226, 232 (4th Cir. 2019); 5 U.S.C. § 706(2)(E). The substantial evidence standard asks the court to determine whether the evidence in the record "*could* satisfy a reasonable factfinder." *See*

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998) (emphasis in original).

III.

A.

To establish an OSHA violation, "the Secretary must prove by a preponderance of the evidence (1) the applicability of the standard, (2) the employer's noncompliance with the terms of the standard, (3) employee access to the violative condition, and (4) the employer's actual or constructive knowledge of the violation . . . ." *N&N Contractors, Inc. v. Occupational Safety & Health Rev. Comm'n*, 255 F.3d 122, 125–26 (4th Cir. 2001). "If (and only if) the Secretary makes out [a] *prima facie* case with respect to all four elements, the employer may then come forward and assert the affirmative defense of unpreventable or unforeseeable employee misconduct." *ComTran*, 722 F.3d at 1308. To establish that defense, an employer must show that it "(1) established a work rule to prevent the reckless behavior and/or unsafe condition from occurring, (2) adequately communicated the rule to its employees, (3) took steps to discover incidents of noncompliance, and (4) effectively enforced the rule whenever employees transgressed it." *Frank Lill & Son, Inc. v. Sec'y of Lab.*, 362 F.3d 840, 845 (D.C. Cir. 2004). Courts often refer to this test as requiring an employer to prove the "adequacy of its safety program." *See ComTran*, 722 F.3d at 1318.

New River raises numerous arguments in its petition for review. Many of these arguments are novel—relating to the proper interpretation and application of the underlying OSHA regulations mandating, among other things, intricate procedures for tagging, reenergizing, and deenergizing lines and equipment—and previously undecided by the

8

Commission or any circuit. But New River also argues that the ALJ misapplied our existing precedent related to the Secretary's burden to prove an employer's constructive knowledge as part of his *prima facie* case. We agree and, because we cannot conclude that this error was harmless, reverse solely on this basis.

B.

New River raises two arguments that relate to the decisive issue—the proper application of the burden of proof on the adequacy of an employer's safety program— though neither argument speaks precisely to the issue. First, New River argues that the ALJ erred by explaining that, under the Commission's precedent, a supervisor's knowledge of his own safety violations can be imputed to an employer. But the ALJ also considered and applied our precedent, holding that only "foreseeable" bad acts can be imputed to the employer and that, in this case, the supervisors' actions were foreseeable.

The ALJ confronted the difficult task of addressing the competing laws of several circuits in reaching this conclusion. Under the Act, New River could have appealed the final order to one of three circuits: the Sixth Circuit, where the violation occurred; the Fourth Circuit, where its principal office is located; or the District of Columbia Circuit. *See* 29 U.S.C. § 660(a). The Sixth Circuit has held that a supervisor's own misconduct can be imputed to the employer, whether or not the misconduct is foreseeable. *See Danis-Shook Joint Venture XXV v. Sec'y of Lab.*, 319 F.3d 805, 812 (6th Cir. 2003). Our precedent requires that a supervisor's misconduct be foreseeable for a violation to be imputed to the employer. *Ocean Elec. Corp. v. Sec'y of Lab.*, 594 F.2d 396, 401 (4th Cir. 1979). The D.C. Circuit has not expressly addressed the issue of supervisory misconduct. The ALJ, to his

9

credit, addressed the tension of these approaches and analyzed the Secretary's case under each formulation. *See* J.A. 102–06.

Second, New River argues that the ALJ erred in placing the burden of proving the adequacy of its safety program on it, rather than the Secretary. New River raises this argument with respect to the affirmative defense of unpreventable employee misconduct, but the cases New River cites in support of this proposition focus on the constructive knowledge element of the Secretary's *prima facie* case.

To satisfy the knowledge element of his *prima facie* case, the Secretary must prove that the employer had actual or constructive knowledge of the violation. *See N&N Contractors*, 255 F.3d at 126. Because "a corporate employer can only act and acquire knowledge through [its] agents," a finding of knowledge is often based on the imputed knowledge of a supervisory employee. *See ComTran*, 722 F.3d at 1311–16 (surveying decisions of the Second, Third, Fourth, Fifth, Sixth, and Tenth circuits). But when the supervisory employee commits the violation, the employer loses its "eyes and ears" to detect and prevent misconduct. *See id.* at 1317.

To avoid unfairly imposing liability on an employer for a rogue supervisor, our circuit requires the Secretary to prove that a supervisor's misconduct was "reasonably foreseeable" to establish the employer had constructive knowledge.[5] *See Ocean Elec. Corp.*

---

[5] Many of our sister circuits have also addressed the question and have reached the same conclusion. *See ComTran*, 722 F.3d at 1316; *W.G. Yates & Sons Constr. Co. v. Occupational Safety & Health Rev. Comm'n*, 459 F.3d 604, 609 (5th Cir. 2006); *Pa. Power & Light Co. v. Occupational Safety & Health Rev. Comm'n,* 737 F.2d 350, 354 (3d Cir. 1984); *Mountain States Tel. & Tel. Co. v. Occupational Safety & Health Rev. Comm'n*, (Continued)

*v. Sec'y of Lab.*, 594 F.2d 396, 401 (4th Cir. 1979). ("But, if the employee's act is an isolated incident of unforeseeable or idiosyncratic behavior, then common sense and the purposes behind the Act require that a citation be set aside.").

The Secretary can prove reasonable foreseeability by showing that an "employer fail[ed] to use reasonable diligence to discern the presence of the violative condition." *N&N Contractors*, 255 F.3d at 127. An employer fails to use reasonable diligence when it violates "the duty to inspect the work area and anticipate hazards, the duty to adequately supervise employees, [or] the duty to implement a proper training program and work rules." *See id.* And while the Secretary can prove foreseeability in a variety of ways, it is the *Secretary's* burden to prove it. *See Ocean Elec.*, 594 F.2d at 401–03.

The Secretary generally may choose to prove that an employer failed to use reasonable diligence—and therefore that the violations were reasonably foreseeable such that the employer can be charged with constructive knowledge—in one of three ways.[6] First, the Secretary may prove a lack of reasonable diligence by demonstrating that the employer failed to take specific risk-prevention measures on the job site where the accident occurred. This is the approach the Secretary took with New River, arguing that the three

---

623 F.2d 155, 158 (10th Cir. 1980). *But see Danis-Shook*, 319 F.3d at 812 (holding that a supervisor's own misconduct can be imputed onto the employer regardless of whether such conduct is foreseeable).

[6] This is not to say, however, that the Secretary *must* employ one of these three strategies to satisfy his burden of proof, only that these are strategies commonly analyzed by this court or the Commission applying our precedent.

11

violations at issue were foreseeable because New River did not create a "grounding plan"[7] or conduct a proper risk assessment before beginning work that day. J.A. 67–69. Second, the Secretary might point to evidence of prior similar violations by employees. *See N&N Contractors*, 255 F.3d at 127–28 (upholding a constructive knowledge finding based on substantial evidence that the employer had previously received two safety violations for similar conduct).

But in a third scenario, the Secretary might prove that an employer failed to use reasonable diligence to discover violations by demonstrating that it has an inadequate safety program or a history of lax enforcement of its work rules. When the Secretary seeks to prove his case this way, "the Secretary's *prima facie* case and the employer's unpreventable[-mis]conduct defense both involve an identical issue: whether the employer had an adequate safety policy." *N.Y. State Elec. & Gas Corp. v. Sec'y of Lab.*, 88 F.3d 98, 106 (2d Cir. 1996). And the resolution of these separate, but related, issues will often involve the same body of evidence.

Unfortunately, this third scenario—where the Secretary's effort to prove constructive knowledge by proving the inadequacy of the employer's safety program and the employer's unpreventable-employee-misconduct defense overlap—has created a "confusing patchwork of conflicting approaches" as to who bears the burden of proving the inadequacy of an employer's safety program. *See L.E. Myers Co. v. Sec'y of Lab.*, 484

---

[7] A "grounding plan" indicates "the nominal voltage, personal protective equipment needed, circuits to be worked, grounding points and number of grounds needed" for a particular project. J.A. 475–76.

U.S. 989, 989 (1987) (White, J., dissenting from denial of certiorari). Thus, before addressing New River's argument that the ALJ erred in concluding that the Secretary had established constructive knowledge of the violation, we examine our existing precedents, which are largely in accord with most circuits that have addressed this issue. *See N.Y. State Elec.*, 88 F.3d at 107–11.

C.

Our history with the often-overlapping doctrines of constructive knowledge and unpreventable employee misconduct begins with *Ocean Electric*, 594 F.2d 396. That case addressed whether and under what circumstances employers can be held liable for their supervisors' actions. *See id.* at 398. We rejected the Secretary's position that all supervisory misconduct can be imputed to the employer, holding instead that the misconduct of supervisory employees can only be imputed to the employer when "a violation by an employee is reasonably foreseeable." *Id.* at 401. Because the Commission improperly shifted the burden of showing the adequacy of its safety program to the employer, we reversed the Commission, explaining that "the Commission placed the burden on the company to show unforeseeability and unpreventability [of a safety violation]," even though "the burden of proof should be on the Secretary."[8] *Id.* Moreover, we found that

---

[8] *Ocean Electric* cited a since-rescinded Commission procedural rule that provided, "In all proceedings commenced by the filing of a notice of contest, the burden of proof shall rest with the Secretary." 594 F.2d at 401–02 (quoting 29 C.F.R. § 2200.73(a)). This rule's recission does not call for reconsideration of *Ocean Electric's* holding. It "was not rescinded because the Secretary no longer has the burden to prove [his] *prima facie* case— [he] obviously does." *ComTran*, 722 F.3d at 1314. This rule was rescinded to clarify for (Continued)

neither party actually raised the adequacy of the employer's safety program at trial before the ALJ; instead that issue was "first brought into the case in the Commission's opinion when it found against the employer for failure to bear the burden of proof." *Id.* at 402.

We faced similar facts in *L.R. Willson & Sons, Inc. v. Occupational Safety & Health Rev. Comm'n*, 134 F.3d 1235 (4th Cir. 1998). There, after establishing that a supervisory employee committed a violation, the Commission shifted the burden to the employer to "establish that it made good[-]faith efforts to comply with the [safety standards]." *Id.* at 1240. Relying on *Ocean Electric*, we reversed, explaining that the Secretary—not the employer—bears the burden of proving the inadequacy of an employer's safety program to satisfy his burden of proof on the constructive knowledge element of a violation. *Id.* at 1240 ("In the present case, however, the Commission ignored this precedent, and having imputed knowledge of the violation because of [the employee's supervisory] position, placed the burden of showing 'good[-]faith efforts to comply with the fall protection standards' squarely on Willson.").

And in a third case, *N&N Contractors*, we upheld the Commission's decision that the Secretary met his burden of establishing constructive knowledge. 255 F.3d at 127. In that case, the Commission did not rely on the adequacy of the employer's safety program to find constructive knowledge. *See id.* Instead, the Commission found that N&N received two safety violations for similar conduct from its general contractor just four months before

*pro se* employers and attorneys that "the employer bears the burden of proof on affirmative defenses." *Id.* (quoting 51 Fed. Reg. 32,002, 32,012 (Sept. 8, 1986)).

14

this incident. *Id.* A supervisor also acknowledged that, a few months prior to the relevant incident, he discovered that N&N employees frequently violated the relevant safety standard. *Id.* We held that the Secretary had met his burden to establish that N&N had constructive knowledge of this violation, and "even if the Commission had impermissibly shifted the burden[,] the error would be harmless" because the "opinion indicates that the constructive knowledge inquiry did not turn on burden of proof rules . . . ." *Id.* at 127–28. We affirmed the Commission's denial of N&N's unpreventable-employee-misconduct defense in that case on similar grounds. *Id.* at 128 n.3.

Read together, these cases establish that the Secretary may rely on the inadequacy of an employer's safety program to prove that a violation was reasonably foreseeable and therefore that the employer had constructive knowledge of a violation. When the Secretary relies on the inadequacy of a safety program to prove this element of his case-in-chief, the Secretary must carry the burden of proof.

But as noted above, the Secretary may establish constructive knowledge *without* addressing the employer's safety program at all. In those cases, an employer may still invoke the affirmative defense of unpreventable employee misconduct. Under those circumstances—when the Secretary does not raise the issue of the adequacy of the safety program but an employer invokes it as an affirmative defense—it is the *employer* who bears the burden of proving all four elements of the defense: specifically, that it "(1) established a work rule to prevent the reckless behavior and/or unsafe condition from occurring, (2) adequately communicated the rule to its employees, (3) took steps to discover incidents of

15

noncompliance, and (4) effectively enforced the rule whenever employees transgressed it." *Frank Lill & Son*, 362 F.3d at 845.

We recognize, however, that some have read our precedents as abrogating the affirmative defense of unpreventable employee misconduct and requiring the Secretary, in every case, to disprove it as part of his case-in-chief. *See, e.g.*, *Md. Comm'r Lab. & Indus. v. Cole Roofing Co.*, 796 A.2d 63, 73–74 (Md. 2002) (mischaracterizing *L.R. Willson* as eliminating unpreventable employee misconduct as an affirmative defense altogether and noting that this position would be a minority view); *Magco of Md., Inc. v. Barr*, 531 S.E.2d 614, 618–19 (Va. App. 2000) (asserting that *L.R. Willson* held that unpreventable employee misconduct was not an affirmative defense but declining to apply the same rule to Virginia's OSHA analog).

In *L.R. Willson*, we stated, "Although some sister circuits have held that unpreventable employee misconduct 'is an affirmative defense that an employer must plead and prove,' this circuit and others clearly agree that such must be disproved by the Secretary in his case-in-chief." 134 F.3d at 1240–41. But that rule is narrow in scope. It only applies when the Secretary relies on the inadequacy of the employer's safety program to prove its constructive knowledge of the violation.[9] If the Secretary elects to impute knowledge to the employer by some other method—for instance, by establishing that an

---

[9] Indeed, in *L.R. Willson* the Commission never charged the Secretary with proving that the foreman's misconduct was foreseeable in his case-in-chief. *See id.* at 1240. After automatically imputing the foremen's knowledge of his own misconduct onto the employer, the Commission prematurely shifted the burden on the adequacy of the safety program to the employer. *See id.* at 1240–41.

employer failed to inspect the work area and anticipate hazards or by a history of similar past violations—he is not required to prove the inadequacy of the employer's safety program.[10] *See N&N Contractors*, 255 F.3d at 127–28. And although in *N&N Contractors*, we referred to the Commission possibly placing the burden to prove unpreventable employee misconduct on the employer as "an error," the court did not address the scenario we now confront in the instant case. *Id.* at 128 n.3.

Thus, neither *L.R. Willson* nor *N&N Contractors* contradicts the well-established proposition that the employer bears the burden to plead and prove an *affirmative defense* of unpreventable employee misconduct. *See ComTran*, 722 F.3d at 1318; *N.Y. State Elec.*, 88 F.3d at 107–08; *Gen. Dynamics Corp. v. Occupational Safety & Health Rev. Comm'n*, 599 F.2d 453, 462–63, 463 n.6 (1st Cir. 1979); *H.B. Zachry Co. v. Occupational Safety & Health Rev. Comm'n*, 638 F.2d 812, 818 (5th Cir. 1981); *Brock v. L.E. Myers Co.*, 818 F.2d 1270, 1276 (6th Cir. 1987). And if the adequacy of the employer's safety program is not at issue to prove constructive knowledge, the employer still may raise the affirmative defense of unpreventable employee misconduct and submit evidence of its safety program. In that

---

[10] Moreover, in cases where the malfeasant employee is not a supervisor, the Secretary can impute knowledge to the employer by showing that a supervisor had actual or constructive knowledge of the subordinate's violation, without requiring a foreseeability analysis. *See Ocean Elec.*, 594 F.2d at 398 ("The basic issue in this case is the extent of a company's responsibility for its *foreman's* actions under OSHA." (emphasis added)). In those cases, the adequacy of an employer's safety program would not be used to support the Secretary's *prima facie* case, though an employer could still raise the affirmative defense of unpreventable employee misconduct.

instance, the employer, not the Secretary, bears the burden of proving this affirmative defense.

We further recognize that the Secretary may seek to prove constructive knowledge by the inadequacy of a safety program, *and* the employer may assert an unpreventable-employee-misconduct defense. *See, e.g.*, *N.Y. State Elec.*, 88 F.3d at 106–07. In those cases, the affirmative defense is effectively subsumed by the knowledge element of the Secretary's case-in-chief. But as *Ocean Electric* and *L.R. Willson* instruct, this does not relieve the Secretary of his burden of proving the knowledge element as part of its *prima facie* case. *See Ocean Elec.*, 594 F.2d at 401–03; *L.R. Willson*, 134 F.3d at 1240. Indeed, the Secretary must first meet his burden of proof, because "the fact that the employer might litigate a similar or even identical issue as an affirmative defense does not logically remove an element from the complainant's case." *N.Y. State Elec.*, 88 F.3d at 107. The Secretary carries the burden of proof on the adequacy of the employer's safety program to establish constructive knowledge and "must first make out a *prima facie* case before the affirmative defense comes into play." *Id.* at 108. In these cases, an ALJ may very well find that the Secretary's success in proving constructive knowledge in his case-in-chief effectively forecloses the employer's unpreventable-employee-misconduct defense. But in reaching that conclusion, the ALJ must still analyze these doctrines separately, under the correct burdens of proof.

### D.

In this case, the Secretary did not allege that New River's safety program was inadequate to prove constructive knowledge. Instead, in his post-trial brief, the Secretary

18

made two primary arguments in favor of finding that New River had constructive knowledge of the violations: (1) that New River did not create a grounding plan for the Madison Mills project; and (2) that New River did not create a proper risk assessment before beginning its work.[11] J.A. 67–68. The Secretary, therefore, did not put New River's safety program at issue during the trial *or* in his post-trial brief. Rather, New River raised the unpreventable-employee-misconduct defense and proffered evidence of its safety policies and disciplinary records to bolster that defense. *See* J.A. 463–752, 768–860. The Secretary's post-trial brief only mentioned the safety program in response to New River's affirmative defense. *See* J.A. 76–81.

In his written decision, however, the ALJ relied heavily on the inadequacy of New River's safety program in holding that the foremen's violations of OSHA safety regulations were foreseeable and therefore that New River had constructive knowledge of the violations. J.A. 104–06. The ALJ found that New River's "safety program was lacking" for a few reasons. J.A. 105. First, New River's "primary method for supervising foremen was through safety audits[,]" which it only conducted "once per month." J.A. 104. Second, the record was devoid of evidence that employees had ever been disciplined for violating similar safety rules; in fact, Superintendent Barnhart testified that he "was unaware of any incident in which employees or foremen did not test or ground," and "that he had never disciplined an employee for failing to test, tag, or ground equipment." J.A. 105. The ALJ

---

[11] Specifically, the Secretary alleges that Foreman Howard submitted a "xerox copy" of an old risk assessment that "he admittedly used at previous job sites." J.A. 67.

also reviewed New River's disciplinary records dating back three years and noted that there was "a dearth of formal disciplinary records for work rule violations pertaining to electrical hazards." J.A. 105. At the end of his two-page constructive-knowledge analysis, the ALJ briefly and summarily mentioned the arguments advanced by the Secretary in a single sentence and concluded that "no grounding plan existed for the job on the site and the [risk assessment] did not mention grounding or tagging to eliminate hazards." J.A. 106.

By relying almost exclusively on the inadequacy of New River's safety program—an issue not raised by the Secretary—to establish constructive knowledge, the ALJ essentially relieved the Secretary of his burden to prove his *prima facie* case. New River put forth evidence about its monthly safety audits and submitted its disciplinary records as evidence. J.A. 463–752, 768–860. These arguments were meant to bolster its affirmative defense. But the ALJ credited New River's evidence to the Secretary's case-in-chief—effectively relieving the Secretary of his burden of proof.

Further, the ALJ only briefly addressed the Secretary's *actual* argument: that the lack of a grounding plan and the lack of a proper risk assessment, combined, established constructive knowledge. The ALJ's heavy reliance on the inadequacy of New River's safety program to support constructive knowledge casts doubt on whether the ALJ would have found the arguments proffered by the Secretary sufficient, standing alone, to prove constructive knowledge.[12] The ALJ should instead have only considered the evidence and

---

[12] This creates a situation where New River might have been better off not raising the unpreventable-employee-misconduct defense at all.

20

arguments actually advanced by the Secretary to ensure that he established his *prima facie* case, before analyzing the affirmative defense. *See N. Y. Elec.*, 88 F.3d at 108 (holding that the Secretary "must first make out a *prima facie* case before the affirmative defense comes into play"). It is axiomatic that, if the plaintiff fails to carry his initial burden of proving an element of his *prima facie* case, no affirmative defense need be proven by the defendant (or considered by the adjudicator) because there is nothing to defend against. *See, e.g.*, *ComTran*, 722 F. 3d at 1318.

This improper allocation of the burden of proof cannot be deemed harmless error. "In the absence of the Secretary making [his] *prima facie* case, [the employer] was not obligated to present *any* evidence on the adequacy of its safety program." *Id.* If the Secretary opted not to argue the inadequacy of New River's safety program, the ALJ should not have relied on that evidence in analyzing the Secretary's case-in-chief. That evidence should have been reserved for consideration of the affirmative defense, *only if* the ALJ determined that the Secretary had met his burden. If the Secretary had chosen to argue the inadequacy of New River's safety program, he had an obligation to put on evidence and advance those arguments initially. Then, New River would have been afforded the opportunity to respond directly to the arguments and evidence raised by the Secretary. *See id.* (holding that the burden-shifting error was not harmless because, "[h]ad the Secretary been required to carry [his] prima facie burden by attempting to show employer knowledge . . . , then [the employer] might have been able to more effectively rebut the Secretary's offer of proof with *specific* evidence in direct response to the alleged inadequacies. As it

was, [the employer] had to guess what particular evidence might have been sufficient to rebut the Secretary and establish the adequacy of its safety program").

IV.

In sum, the ALJ erred[13] by relieving the Secretary of his burden to prove New River had constructive knowledge. This error cannot be deemed harmless because it is not apparent, based on the record before us, that the ALJ would have reached the same result based solely on the arguments and evidence presented by the Secretary. We therefore reverse the Commission's final order, and remand to the Commission for further proceedings that properly allocate the burdens of proof between the parties.

*REVERSED AND REMANDED*

---

[13] We use "erred" delicately here, recognizing that the ALJ navigated a "confusing patchwork of conflicting approaches" among the circuits and the Commission's own precedent. *See L.E. Myers*, 484 U.S. at 989 (White, J., dissenting from denial of certiorari).